Good morning, your honors. Reynolds Finnegan on behalf of petitioners Sam Bell Harrapetyan and his wife. In this matter, I believe the asylum case hinges upon credibility. And there are several things and points that the immigration judge pointed to and a couple that the Board of Immigration pointed to. The main one was the death certificate of the petitioner's son which came back purportedly fraudulent. As argued at trial and in the briefs, the petitioner did not obtain this document himself. He obtained it through his brother-in-law. When he first obtained it, he testified he did not look at the document. He was grieving for his son's loss. And it was only later that they determined that maybe this document was not obtained through the normal channel. As such, under Ninth Circuit cases of Yemeni and others, the credibility should not be the adverse part. It hinged upon this petitioner because he did not obtain the document. He did not vouch for the genuineness of the document. And as such, there was other evidence in the record in terms of photographs. What does the death certificate say? Besides reporting his death, does it give a cause of death? I have to look at it. I believe it said he died in the arson file, but I'd have to take a look at the actual certificate. I just wonder how much it increased or enhanced their claim. I just don't know. I'm not sure, Your Honor. I'd have to look at it. Can you look at it? Maybe when you sit down, you can look at it and tell us when you come back. Okay. I'll try to take a look at it. Before you leave the death certificate, basically he submitted this as evidence, but when it turns out to be determined as fraudulent, he washes his hands and says, well, I'm not the guy who got it, and I never looked at it in the first instance. But what's the alternative story? That the brother-in-law went and forged a document and sent it when it wouldn't apparently benefit the brother-in-law at all? I think what happens is in a lot of countries, Armenia in particular, when a family member in the United States requests a document back home, that person can go to the authorities and go through the proper channels and probably pay some money to get the document. In an interest to expedite the process and go faster, sometimes they use a middleman, and maybe the middleman takes money and prints up a document that's not exactly the one registered in an essence to. Everything runs on money over there. So the implication is that there's a middleman making money somewhere. Now we've got problems because we're not even confident that they've got a kid. We're not confident that the son died in a fire. We're not confident that if he died in a fire, that he died in a fire that was set for political reasons. There's a whole chain of inferences that starts to fall here. This is a very, very serious and very dramatic claim by your client. You know, it's hard to think of anything more compelling than that some kind of government-related officials have set fire to your home and killed your son who was, whatever, seven or eight years old. And all of a sudden, the whole thing starts to fall because we've got a phony death certificate. So what are we supposed to do? I mean, this is pretty damning evidence against your client's story. I understand what you're saying, Your Honor. I believe what we do is we look at the case law, which states that, you know, in order for a document that's judged fraudulent, for that fraudulent finding to be impinged or brought into respondent's petitioner's case in this instance, the asylum applicant's case, there has to be, you know, a nexus. There has to be formal evidentiary requirements. And if those aren't met, if there's no foundation laid that this is respondent, not respondent, I'm sorry, that's what we call it in immigration court, but the petitioner does not obtain this document, then under the evidentiary rules, you can't impinge that adverse credibility upon the petitioner. No, except that he's proffered it as an authentic death certificate. And if we just pull this whole thing, if we say, okay, well, if we just sort of suppress all of the evidence, then a big part of his story goes away. It's important. I understand your point. It is important. But regardless of the death certificate, there's photographs, there's oral testimony, there's other evidence in the record to support the asylum claim. It is a pre-Real ID Act case. It started before May 11, 2005. As such, the more lenient analysis should be done. I believe if you look at the other testimony and evidence of the record, there is a viable asylum claim. Other points that were raised were that he did not know the presidential candidate in 1996 of his political party. Would you address the kidney injury question? Yes. There was another issue as to that. I believe the respondent explained that later. But as the government points out in their respondent's brief, they said that why his explanation creates more confusion. I believe it doesn't. I believe he explained the misperception, which was that both kidneys were injured. Petitioner testified, no, it was my left kidney. And that explains it. So I believe why there was some confusion. Some petitioners don't testify completely coherently. They're from different countries. But I believe he explained it. And as it's explained, we must accept his explanation, or we should accept his explanation, in that it's no longer an inconsistency. The political party, I believe that this case is more a grava, a whistleblower political opinion than actually. Even though he was a member of the political party, it wasn't based upon his membership in the political party. Therefore, you can understand why he was a little confused on which particular candidate was running for the election. Couple that with the fact that these political parties change their allegiance all the time between the first election and the runoff election. I believe that explains that perceived discrepancy as well. With regard to the treatment, there was a discrepancy with regard to whether he was treated by a private doctor or treated by a woman at the house. And discrepancies as to whether he was advised after being released to visit locally based specialists. And it's alleged there were none. So instead went to a larger city. There are lots of little things that start to, cited by the IJ, raise questions about whether this person has a story to tell based on what actually happened or is simply telling a story. I understand, Your Honor. In this case, I believe the discrepancy regarding the private doctor treatment versus the women at the village relates to his written asylum application, which states that he was treated at home by a private doctor. He testified in court that he received treatment at home by women in the village. The salient point here is that he did not go to a clinic. He did not go to a hospital. He was treated at home. The difference was private doctor versus women at the village. In my mind, under pre-Real ID Act case law, that's not a major discrepancy. I believe it's more of an explanation during the court proceedings that, you know, maybe it was not a doctor per se. It was an individual. Maybe it was a woman. But he received treatment at home. And that alone I don't think is enough for an adverse credibility finding under pre-Real ID Act case law. The second issue that Your Honor mentioned was the ‑‑ refresh my memory, which was? It had to do with after he was released. Was it doctors or a medical? Oh, about the document, yeah. The document states on the medical document that he should get further treatment at his local area, whereas orally he testified. The doctor told him orally that you should go to the big city, the capital, to get treatment. You need a specialist. I believe it was a neurologist specialist. And that was different than what was on the document. The IJ made a considerable point of that. Actually excluded the document from evidence. Argument is it should not have been excluded. It should go to wait, first of all. And secondly, if you review petitioner's testimony, he testified to other stuff as well, which is the doctor advised him to eat watermelon and wear a tight belt. That wasn't in the writing either. So I believe it was further clarification rather than an actual, you know, hard discrepancy, inconsistency per se. I'd like to reserve my 30 seconds, if I may, Your Honor. Okay. Would you take a look at the death certificate? Okay. Good morning.  May it please the Court. This is an asylum credibility case in which nearly every element of the petitioner's claim is questionable on credibility grounds. We really don't know who he is in the sense that he claimed to be a party organizer, yet he doesn't know his party's successful candidate for president in 1996. He also claimed that he worked for customs as a border inspector, yet he doesn't know who the chief of the customs department is. And we really don't know what happened to him and his family. Was he beaten once or twice on that day that he spoke out at the party meeting? In his declaration, he says twice. In his testimony, it was once. Was he hospitalized in February or in March or in May? Was the main trauma an injury to his right kidney or to his left kidney? We've heard both versions from him. Was he treated by relatives? Was he treated for injuries after a second alleged beating by a private doctor, or was he treated by women who were neighbors in his village? If his house was burned and one of his children died in the fire, why do we have a counterfeit death certificate as proof of that event? What does the death certificate prove? The death certificate would establish, if it was real, the name of the individual who died and the fact that that death was recorded in Armenia at the time. And I think if it was genuine, it wouldn't establish necessarily that that was their child, but you could certainly infer that because he has the family name. So it would go a long way to help. Does it establish the cause of that? Well, not in the sense that members of an armed militia set fire to the house and caused it, but it does establish that it's by fire. It does establish that. It says damage. This is an English translation. Damage of the life important organs functioning because of the burn third category. Well, that's certainly relevant. So I think if it had been a valid document, it wouldn't connect it to political opinion or why the house was set on fire or anything like that. So there would be more that needed to be proven. But this is a heart of the claim document in the sense that the degree of harm to him and his family is part of the claim material. The death certificate shows a place of death. Do we have any evidence that this was the family home? The evidence, it mentions Magri District, and the transcript has a spelling that inserts an H in there, but I would be willing to concede for these purposes that that's the same district that his family, that he testified his family was from. Now, we don't, the citizen, Alexa, was not, we don't have any age on him, do we? So we don't know whether this is a child or an adult on the death certificate. I'm just scanning it quickly, Your Honor. I would have to say no, but no, no, no parents listed. I don't see parents listed. Do we have, did the petitioner provide any evidence that he had a son named Alexa? His testimony, there was no birth certificate and he was questioned about that. Why no birth certificate? He said in Armenia when a person dies, the state requests that you return the birth certificate. No explanation for that was given. We did have some family photographs, right? But not in the record, Your Honor, and I read the record and I can't quite figure out why they're not in the record except that the immigration judge had a deadline for good reason, for submission of documents, the reason being that the government needed the right, needed the ability to check out these documents. I am assuming that the photos aren't in the record because there's no objection made to them not being in the record because they surfaced after the deadline. Do we have any evidence in the record that this family had a child named Alexa? Other than testimony from incredible witnesses, no. Who testifies? The only witness to testify other than the government's expert on the forensic document examiner was the lead petitioner. The final point that I was going to make about discrepancies has to do with the medical record. The medical record, was it genuine or counterfeit? It came from the same source. The petitioner was asked if it was genuine or counterfeit and he said he doesn't know. Well, I don't think that leaves us with much of anything here that would compel the court to reverse the board. In fact, while it's not required, I think the evidence almost compels a finding of incredibility here. The case of Lee… What's this other evidence that comes from the same source? I'm sorry, Your Honor. What is the other evidence that you mean comes from the brother-in-law? Yes, it's referred to as the medical document. It's from his only hospitalization, allegedly, that occurred after he first spoke out. He claimed he was beaten on one or two occasions, depending on which account you believe, that very day, and then went to the hospital for 15 days. And you say his brother-in-law got that? Yes. That document came from the same source, and when asked if he knew if it was counterfeit or not, he said he didn't know. The document, the forensic examiner did not examine that, so there's no affirmative evidence that the document is counterfeit. It's just another questionable part of the whole story, given the source. This Court's case in Lee v. Ashcroft says if even one of the identified grounds for lack of credibility is supported by substantial evidence, the decision has to be upheld. In this case, the Court can pick from among many, and the decision should be upheld. Thank you. Thank you. We'll now hear from Petitioner's Counsel for rebuttal. Good morning. So I guess that answered your question on the death certificate, Your Honor. You've got nothing to add to that. Yeah, nothing to add on the death certificate. What about the evidence that the Stanley had a child? Yeah, it was on the birth certificate. There's no other evidence other than him saying that I had a child who was killed in a car accident. Right. Okay, that is right. That is right. And I would point out the BIA did not list the whole litany. They kind of focused on the death certificate, and that's why I was focusing on the death certificate. The other ones I believe are either minor or were adequately explained. And as such, I submit to the Court. Thank you. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Noonan, Clifton, Bybee